UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **US INVENTOR, INC. et al.,**<br>      Plaintiffs,<br><br>      v.<br><br>**UNITED STATES PATENT AND<br>TRADEMARK OFFICE et al.,**<br>      Defendants. | Civil Action No. 22-2218 (JDB) |

### MEMORANDUM OPINION

Plaintiffs US Inventor, Inc. and National Small Business United ("NSBU") bring this action against defendants the U.S. Patent and Trademark Office ("USPTO") and Katherine Vidal, the Under Secretary of Commerce for Intellectual Property and Director of the USPTO, alleging that defendants violated the Administrative Procedure Act ("APA") by denying plaintiffs' rulemaking petition. Defendants move to dismiss the case, arguing that plaintiffs lack standing. For the reasons set forth herein, the Court concludes that plaintiffs lack standing and will accordingly grant defendants' motion to dismiss on that basis.

### Background

In 2011, Congress passed the America Invents Act ("AIA"), which established the Patent Trial and Appeals Board ("PTAB") within the USPTO. Compl. for Decl. & Injunctive Relief [ECF No. 1] ("Compl.") ¶ 18; see 35 U.S.C. § 6. The AIA vested authority in the PTAB to conduct various proceedings by which the validity of patents may be challenged, including inter partes review ("IPR") and post-grant review ("PGR") proceedings (together, "AIA trials"). See Compl. ¶ 18; 35 U.S.C. § 6(b).

The IPR and PGR processes begin when "a person who is not the owner of a patent" files a petition with the USPTO challenging the patent and requesting that an AIA trial take place.

1

35 U.S.C. §§ 311(a), 321(a). When a petition is filed, the Director of the USPTO decides whether to institute an AIA trial. Id. §§ 324(b), 314(c). "The Director may not authorize an inter partes review to be instituted unless the Director determines that . . . there is a reasonable likelihood that the [patent challenger] would prevail with respect to at least 1 of the claims challenged in the petition." Id. § 314(a); see also id. § 324(a) ("The Director may not authorize a post-grant review to be instituted unless . . . it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable."). No equivalent statutory mandate exists that dictates when a Director must institute a trial: even if a patent challenger makes the required showing that a patent is likely invalid, the Director may still, in her discretion, decide not to institute an AIA trial. See Compl. ¶ 19 ("The AIA set only a one-sided (prohibitory) bound on the Director's authority . . . ."); Cuozzo Speed Techs., LLC v. Lee, 579 U.S. 261, 273 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion.").

If the Director decides not to institute review, that decision is "final and nonappealable." 35 U.S.C. §§ 314(d), 324(e). But a disgruntled patent challenger has a second avenue to challenge a patent: challenges to a patent's validity may be brought in U.S. District Court either instead of an AIA petition or following the Director's decision not to institute an AIA trial. See Credit Acceptance Corp. v. Westlake Servs., 859 F.3d 1044, 1052–53 (Fed. Cir. 2017).

Congress did cabin the Director's discretion to decline to institute an AIA trial in one important way: 35 U.S.C. §§ 316 and 326 require that "the Director . . . prescribe regulations . . . setting forth the standards for the showing of sufficient grounds to institute" an AIA trial. Compl. ¶ 26 (cleaned up) (quoting 35 U.S.C. §§ 316(a), 326(a)). The USPTO has accordingly designated "as precedential or informative certain cases that identify considerations for the Board's exercise of the Director's discretion over the institution decision." Defs.' Mot. to Dismiss [ECF No. 6] ("Mot. to Dismiss") at 5. "The principles announced in some of those cases have also been

incorporated into a Consolidated Trial Practice Guide." Id. at 6. And in October 2020, the Director "issued a request for comments seeking the public's view on 'considerations for instituting trials' before the Board under the AIA." Id.; see also Ex. B to Compl. [ECF No. 1-2] ("USPTO Decision") at 2.

Plaintiffs' position is that the USPTO's approach to providing guidelines—designating some opinions "precedential" or "informative" without putting those considerations through notice-and-comment rulemaking—is unlawful. See Compl. ¶¶ 32–36 (describing this approach as an "end-run[]" around the APA and "extra-regulatory").[1] US Inventor expressed that same position in a lawsuit it filed in 2021 in the U.S. District Court for the Eastern District of Texas. See US Inventor Inc. v. Hirshfeld, 549 F. Supp. 3d 549, 553 (E.D. Tex. 2021) ("Plaintiffs generally allege that the Director's designation of such decisions as precedential constitutes unlawful rulemaking without the formal notice and comment required under the Administrative Procedures Act ('APA'), 5 U.S.C. § 553."), aff'd sub nom. US Inventor Inc. v. Vidal, No. 21-40601, 2022 WL 4595001 (5th Cir. Sept. 30, 2022), and appeal dismissed No. 2021-2212, 2022 WL 17246329 (Fed. Cir. Nov. 28, 2022). That case—which will be discussed throughout this Opinion—was dismissed for lack of standing in July 2021, id. at 559, a decision which was affirmed by the Fifth Circuit in September 2022, US Inventor Inc. v. Vidal, No. 21-40601, 2022 WL 4595001, at *7 (5th Cir. Sept. 30, 2022).

On August 27, 2020, following the dismissal of the Eastern District of Texas case, US Inventor and NSBU jointly filed a petition for rulemaking with the USPTO under 5 U.S.C. § 553(e). Compl. ¶ 13; see Ex. A to Compl. [ECF No. 1-1] ("Petition"). The petition proposed a

---

[1] Although plaintiffs' well-pleaded allegations are taken as true at the motion to dismiss stage, the Court need not accept "legal conclusions cast in the form of factual allegations," which many of plaintiffs' allegations in this section of their complaint are. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal quotation marks omitted).

3

rule establishing a series of criteria the USPTO would use when deciding whether to institute an AIA trial.[2]  Compl ¶ 13; see Petition at 12–14.  On October 19, 2021, defendants denied the petition.  Compl. ¶ 14; see USPTO Decision at 3.  The USPTO stated that it, "in principle, supports the goal of providing clarity as to institution standards for AIA trials" and accordingly had requested "feedback from stakeholders on the current practices of the Patent Trial and Appeal Board in exercising discretion not to institute an AIA trial proceeding."  USPTO Decision at 2.  And because "[t]he issues raised in the Petition overlap [with] those raised in the" request for comments, it "denie[d] the Petition, with the understanding that suggestions provided in the Petition w[ould] be considered as part of any future rulemaking on AIA trials."  Id. at 3.

Plaintiffs challenge this denial.  Their complaint alleges a violation of the APA, 5 U.S.C. §§ 553, 555, and 706.  Compl. ¶¶ 46–62.  There are a few dimensions to their claim.  First, plaintiffs claim that the USPTO violated § 555(b)'s procedural requirement "that 'within a reasonable time, each agency shall proceed to conclude a matter presented to it,'" id. ¶ 52 (quoting § 555(b)), by stating that plaintiffs' rulemaking suggestions "would be considered only in unspecified 'future rulemaking on AIA trials,'" id. ¶ 62.  Section 706 allows enforcement of this requirement by "requir[ing] [courts] to 'compel agency action unlawfully withheld or unreasonably delayed.'"  Id. ¶ 47 (quoting § 706(1)).

Plaintiffs also challenge the denial of the petition under § 555(e), which requires that the USPTO provide notice of the denial and that such notice "shall be accompanied by a brief statement of the grounds for denial."  Compl. ¶ 53 (quoting § 555(e)).  According to plaintiffs, "[t]he USPTO's reasoning that it will not presently commence with rulemaking because it may

---

[2] The petition also suggested a rule defining "privy," see Petition at 12, which is not at issue in this case.

commence with rulemaking later is not a 'statement of the grounds for denial' required under the APA" and is also arbitrary and capricious. Id. ¶ 61.

Finally, plaintiffs argue that the AIA's statutory framework requires the USPTO to promulgate "regulations to address the factors governing denial of AIA trial petitions" via notice-and-comment rulemaking, and accordingly, plaintiffs claim that "[i]n view of th[at] statutory framework . . . and the USPTO's obligation to properly address the Petition, the Denial was contrary to law." See id. ¶¶ 49–51, 54–59.

Plaintiffs accordingly seek (1) "[a] declaration that [defendants] unlawfully denied the Petition because the absence of regulations governing AIA trial institution factors is contrary to 35 U.S.C. §§ 316(a) and 326(a)," (2) "[a] declaration that [defendants'] denial of the Petition was an action unlawfully withheld, was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," and (3) "[v]acatur of the USPTO's decision to deny the Petition and an order that the USPTO promptly act to conclude the matter presented to it [in] the Petition in compliance with law." Compl. at 21.

Defendants filed the present motion to dismiss on September 30, 2022. See Mot. to Dismiss. Plaintiffs responded in opposition on November 15, 2022, see Pls.' Resp. & Mem. in Opp'n to Mot. to Dismiss [ECF No. 13] ("Opp'n"), and defendants filed a reply in support of their motion on December 15, 2022, see Defs.' Reply in Supp. of Mot. to Dismiss [ECF No. 16] ("Reply").

On the same day it filed its motion to dismiss, defendants also filed a motion asking the Court to excuse them from the requirements of Local Civil Rule 7(n), which requires defendant agencies to provide plaintiffs with an administrative record and file an administrative index record with the Court. See Defs.' Mot. for Relief from Compliance with Local Rule 7(n) & Mem. in Supp. [ECF No. 7] ("Mot. for Relief"). Plaintiffs filed an opposition this motion, see Pls.' Resp.

5

in Opp'n to Mot. for Relief and Mem. in Supp. of Opp'n [ECF No. 14] ("Opp'n to Mot. for Relief"), and defendants filed a reply in support of its motion, see Defs.' Reply in Supp. of Mot. for Relief [ECF No. 17]. Both motions are now ripe for decision.

## Analysis

### I.  Motion to Dismiss

Defendants move to dismiss the complaint for lack of standing. Plaintiffs bear the burden of establishing standing and, to do so, "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). "Injury in fact is the 'invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). In general, "when considering any chain of allegations for standing purposes, [courts] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (cleaned up). Thus, "[t]he 'causal connection between the injury and the conduct complained of' must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Arpaio, 797 F.3d at 19 (quoting Lujan, 504 U.S. at 561). "And it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Id. (quoting Lujan, 504 U.S. at 561).

In assessing a motion to dismiss for lack of standing, courts "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor." Humane Soc'y, 797 F.3d at 8. However, courts "do not assume the truth of legal conclusions, nor

do [they] accept inferences that are unsupported by the facts set out in the complaint." Arpaio, 797 F.3d at 19 (cleaned up).

Not every denial of a petition for rulemaking confers Article III standing on the petitioner. See Gettman v. Drug Enf't Admin., 290 F.3d 430, 433 (D.C. Cir. 2002) ("The fact that Congress may have given all interested parties the right to petition the agency does not in turn 'automatic[ally]' confer Article III standing when that right is deprived."). Instead, to make out a viable challenge to the denial of the petition in federal court, plaintiffs must show that the deprivation of the procedural right—here, the denial of the petition—caused an "injury in fact, both particularized and concrete, as required by the Constitution." Id. at 434.

Organizational plaintiffs like US Inventor and NSBU can establish such standing in two ways: they "may assert standing on [their] own behalf," known as "organizational standing," see Food & Water Watch, 808 F.3d at 919, or they may assert "associational standing" based on injuries to the organizations' members, see Sierra Club v. E.P.A., 754 F.3d 995, 999 (D.C. Cir. 2014). Plaintiffs assert standing under both theories.

**A. Organizational Standing**

"Courts in this Circuit use a 'two-part inquiry' for assessing whether an organization has sufficiently alleged injury-in-fact, asking 'first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm.'" Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch, Civ. A. No. 21-853 (JDB), 2022 WL 951271, at *4 (D.D.C. Mar. 30, 2022) (quoting Food & Water Watch, 808 F.3d at 919), reconsideration denied, Civ. A. No. 21-853 (JDB), 2022 WL 2290538 (D.D.C. June 25, 2022). "[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury," Food & Water Watch, 808 F.3d at 919; rather, the challenged action must have "perceptibly impaired the

7

organization's ability to provide services," id. (quoting Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015)).  Such injury must be "more than simply a setback to the organization's abstract social interests," and the expenditure of "operational costs" that do not go "beyond those normally expended to review, challenge, and educate" about the subject matter are insufficient. Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433–34 (D.C. Cir. 1995) (internal quotation marks omitted).

Plaintiffs assert that "US Inventor and NSBU have been harmed by [the denial of the petition] as organizations."  Compl. ¶ 45.  However, the complaint only asserts specific harms suffered by US Inventor, see id.; Ex. F. to Compl. [ECF No. 1-6] ("Malone Decl."), and plaintiffs do not focus argument in their opposition on either organization's standing in its own right. Particularly in light of the lack of opposition by plaintiffs, the Court agrees with defendants that neither organizational plaintiff has sufficiently pled organizational standing.

In a declaration attached to their complaint, plaintiffs allege that US Inventor is "hamstrung in its efforts to teach inventors about keeping their patents free of AIA trial reviews" and "is temporarily forced to advise its members that not participating in the U.S. patent system, reducing investments in inventing, and/or . . . keeping their inventions secret may now (solely because of AIA trial reviews) be the best way forward."  Malone Decl. ¶ 29.  Those "mitigation measures undermine [its] core mission of fostering innovation and helping inventors to achieve the American Dream, build businesses, and create jobs."  Id.  And, plaintiffs allege, due to the denial of the Petition, "US Inventor so far lacks a procedural way to give its comments on published proposed rules."  Id.

The first alleged harm—US Inventor's change in how to educate its members—is a quintessential example of a cost that does not go "beyond those normally expended to . . . educate" its members.  Nat'l Taxpayers Union, 68 F.3d at 1434.  And to the extent that US Inventor's

complaint is that the resultant change in <u>subject matter</u> about which it must educate its members "undermine[s] [its] core mission," Malone Decl. ¶ 29, that complaint is nothing more than "frustration of its purpose," <u>Food & Water Watch</u>, 808 F.3d at 919, which "is the type of abstract concern that does not impart standing," <u>id.</u> (quoting <u>Nat'l Taxpayers Union</u>, 68 F.3d at 1433). See <u>US Inventor</u>, 2022 WL 4595001, at *6 (finding no organizational standing as US Inventor "ha[d] not shown how their specified activities actually differ from US Inventor's routine operations or how the Director's alleged failure to promulgate rulemaking has caused US Inventor to depart from its ordinary activities").

US Inventor's complaint that it "lacks a procedural way to give its comments on published proposed rules," Malone Decl. ¶ 29, is similarly lacking. "[A]n organization cannot show injury-in-fact just by alleging that agency action will make future lobbying . . . efforts more difficult." <u>Commissioned Officers Ass'n</u>, 2022 WL 951271, at *6 (citing <u>Food & Water Watch</u>, 808 F.3d at 920). US Inventor's utilization of methods other than submitting comments on proposed rules to advocate for its policy positions is an "operational cost[] . . . normally expended to carry out its advocacy mission" and is insufficient to confer standing. <u>Nat'l Ass'n of Home Builders v. E.P.A.</u>, 667 F.3d 6, 12 (D.C. Cir. 2011) (internal quotation marks omitted). Under this theory of standing, any individual or organization that may have an interest in administrative decisions could have standing to bring a claim such as this. "[S]uch a result is untenable," and thus courts "require more concrete allegation of harm . . . before finding sufficient injury in fact." <u>Nat'l Taxpayers Union</u>, 68 F.3d at 1434.

Hence, the Court concludes that neither plaintiff has organizational standing.

### B.  Associational Standing

Plaintiffs primarily rely on an associational standing theory, which premises an organization's standing on the standing of its individual members. To establish associational

9

standing, organizations must show that "(1) at least one of their members would have standing to sue; (2) the interests they seek to protect are germane to the organizations' purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." Sierra Club, 754 F.3d at 999.

US Inventor's membership includes individuals and businesses who own patents and "who were, are and will be respondents to" AIA trials. Compl. ¶ 5. Some of those members would, if available, "use rules promulgated under the rulemaking Petition . . . to 'veto' being hauled into a PTAB trial." Id. Without that "veto" power that the proposal in the Petition would grant them, plaintiffs allege, members would "face an increased risk of patent cancellation under PTAB procedures biased against patent owners." Id. As to the other two requirements of associational standing, plaintiffs allege that the interests here are "connected to US Inventor's purpose" and "neither the present claim nor the relief requested requires participation of US Inventor's members." Id. ¶ 7. Plaintiffs make similar claims about NBSU and its members. See id. ¶ 8; see also id. ¶ 45 ("Numerous members of US Inventor and NSBU have been directly harmed and continue to be harmed by Denial of the Petition.").

In opposition, the government argues that any injury suffered by plaintiffs' members due to the denial of the Petition is too speculative to confer Article III standing. Mot. to Dismiss at 14 ("Plaintiffs . . . do not (and cannot) demonstrate that the denial of the Rulemaking Petition (and the resulting absence of notice-and-comment rulemaking) has actually negatively and concretely affected [members'] patent rights."). As the government explains, in order for that harm to be realized, the following chain of events must occur:

> (1) a third party will file an IPR or PGR petition for review of a specific patent held by a member of each of their organizations; (2) the IPR or PGR petition would satisfy the minimum standards for institution of such a proceeding; (3) the Board would not exercise the Director's discretionary authority to decline institution under the current guidance, but would do so under a new regulation that the USPTO would adopt if it had granted Plaintiffs' Rulemaking Petition; and (4) the institution

10

> of IPR or PGR proceedings creates a substantially higher probability of improper cancellation of the patent than adjudication of the same claims through other proceedings, such as district court litigation.

Id. at 16; see also US Inventor, 2022 WL 4595001, at *3 (identifying a similar chain of injury). At first glance, this chain of events seems quite speculative. And it seems even more so when taking into account the independent likelihood of each event's occurrence and the amount of "speculation about the decisions of independent actors." See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 (2013). For their part, plaintiffs argue that each of these steps is highly likely to happen such that "Plaintiffs' members' risk of harm is both sufficiently imminent and substantial." Opp'n at 24. But their reasons for why each event is likely to occur do not hold up under scrutiny.

To begin, the IPR and PGR processes start with a third party filing a petition with the USPTO. That action itself—which is required to set off this chain of injury—is entirely within the control and discretion of a third party. See US Inventor, 2022 WL 4595001, at *4 ("This case presents a . . . chain of events requiring us to speculate—at minimum—whether a . . . third-party challenge will occur . . . ."). Plaintiffs claim that they have "described generally, and named specifically, patent owner-members . . . who have faced, are facing, and will continue to face IPR and PGR proceedings." Opp'n at 32. Members who have already faced AIA proceedings cannot confer standing to plaintiffs to bring a claim for prospective relief, see City of L.A. v. Lyons, 461 U.S. 95, 105 (1983) (noting that past injury "does nothing to establish a real and immediate threat"), and identifying members who might face IPR and PGR proceedings—if a third party files a petition against them—is still a speculative link in the chain, see Cierco v. Mnuchin, 857 F.3d 407, 418 (D.C. Cir. 2017) (noting that courts "are particularly disinclined 'to endorse standing theories that rest on speculation about the decisions of independent actors'" (quoting Clapper, 568 U.S. at 414)).

11

Plaintiffs assert that the USPTO's denial of the petition caused a concrete injury because, by declining to grant the petition and instead relying on the current framework for discretionary denials, the PTAB will institute AIA Trials against members that otherwise would not have been instituted. To begin, there are numerous reasons unrelated to the proposed rule changes in plaintiffs' petition why the PTAB would decline to institute AIA proceedings following the submission of a petition by a third party. These include merits reasons (which are captured in the second step of the injury chain), as the PTAB may only institute AIA proceedings if it "determines that . . . there is a reasonable likelihood that the [patent challenger] would prevail with respect to at least 1 of the claims challenged in the petition," 35 U.S.C. § 314(a); see also id. § 324, as well as discretionary denials under the current guidance. Those reasons make it substantially less likely that, had plaintiffs' petition been granted, any proposed change contained therein would be dispositive in any particular decision not to institute an AIA trial against a member.

Plaintiffs claim that they can identify members that would, in fact, face an AIA Trial under the current system but would not if defendants had granted plaintiffs' petition, but plaintiffs fail to actually do so. For example, plaintiffs point to a company called 10Tales as an example of a member "whose imminent injury-in-fact is palpable." Opp'n at 10; see Malone Decl. ¶¶ 18–19. But by plaintiffs' own telling, "the PTAB denied [AIA trial] institution on the merits of patentability on August 13, 2021" without even reaching consideration of the discretionary factors that the proposed rule would change. Malone Decl. ¶ 18 (emphasis added). 10Tales' situation underscores why the injury—even to those members who have had petitions filed against them—remains speculative, as the likelihood that an AIA trial would be instituted under the current rules but would not be instituted had defendants granted plaintiffs' petition is slim.

Of course, there may be some challenges to members' patents that make it past the merits stage, rendering the PTAB's exercise of discretion the only route by which members can avoid an

AIA trial. For example, the current guidance does not formally provide that the PTAB should take into account a patent owner's status as a small business when deciding whether to institute an AIA trial, while plaintiffs' Petition proposes that the PTAB should take into account "the economic small entity status of the patent owner." Opp'n at 28; see Petition at 13. Thus, plaintiffs argue, for members that are small businesses, the likelihood of injury is not speculative because if "the Petition for rulemaking proceeding [were] granted," the "likely result" would be that the PTAB would decline to institute an AIA trial in those situations "due to the economic small entity status of the patent owner." Opp'n at 28. But even if the Court assumes "that any future, final regulation would have discrete and bright-line rules exempting [their members],"[3] Reply at 13, that injury analysis still requires speculation as to whether an individual decision-maker would in fact institute an AIA trial against a patent holder. Even under the current guidance—which does not contain any express exception for small businesses—the PTAB could certainly exercise its discretion to deny institution on that basis or otherwise. See US Inventor, 549 F. Supp. 3d at 553 (collecting cases holding that "the agency's decision to deny a petition is a matter committed to the Patent Office's discretion"). In sum, plaintiffs have not shown that the likelihood of injury for any given member—even members whose patents have a petition filed against them, which then passes the merits stage of non-institution—is likely to be different because plaintiffs have not demonstrated the likelihood that a "patentee-favorable" notice-and-comment rule would alter the discretionary institution decision.[4]

---

[3] In challenging a procedural injury, the Court relaxes "the normal standards for redressability and immediacy" and requires plaintiffs to show only that they have been denied "a procedural right" that would "protect [their] concrete interests." Lujan, 504 U.S. at 573 n.7. Plaintiffs thus do not need to "establish with any certainty" that a ruling in their favor here would cause the petition to, in fact, be granted. Id.

[4] This is not to say that entities like plaintiffs will never have standing to challenge a proposed change to a discretionary consideration. But the likelihood of the exercise of discretion, combined with the numerous other speculative links in the chain, contributes to the uncertain nature of the injury in this case.

Finally, plaintiffs' complaint identifies the harm to members as not just the AIA trial institution, but also as the resultant patent cancellation at the conclusion of that trial. See, e.g., Compl. ¶ 7 (describing "members' interest in preserving their patent rights from cancellation"). Thus, under step four of the injury chain, plaintiffs must show a high likelihood that patents would be cancelled through AIA trials (once instituted) that otherwise would not be with the proposed rule change. Defendants respond that the actual risk of patent cancellation is the same, or at least not significantly different, whether or not AIA proceedings are instituted because patent challengers may always challenge a patent in district court, and thus patents that are actually invalid are likely to be cancelled through that process in any event. See Mot. to Dismiss at 16; see also US Inventor, 2022 WL 4595001, at *4 (noting that standing analysis requires speculation as to "how a district court would otherwise rule on the patent claims at issue"). Plaintiffs argue that patent cancellation is more likely through an AIA trial than in a district court proceeding, relying on statistics showing higher rates of cancellation in AIA trials. See Compl. ¶ 5; Malone Decl. ¶ 11 (explaining that "PTAB invalidates (in whole or in part) 84% of patents that reach a final decision" and "federal court cases that reach a final decision on the question of patent validity result in invalidity only about 29% of the time"). Those numbers appear shocking until the reader realizes that PTAB proceedings are only authorized if the USPTO believes there is a high likelihood of invalidity. See Mot. to Dismiss at 16–18 (describing issues with these statistics). Defendants thus counter that when one takes into account all AIA petitions, not just those that reach a final decision, "the Board found the challenged patent to be all or partially unpatentable only 21% of the time in fiscal year 2021." Id. at 17.

The Court is hesitant to draw any sort of conclusion from these statistics given the numerous factors discussed in this Opinion that affect a third party's decision to petition the PTAB and the PTAB's decision to institute a trial. "[S]imply comparing patent challenges in an IPR/PGR

14

to challenges in a district court is likely an apples-to-oranges comparison that fails to meet the rigor [courts] expect in a standing analysis." US Inventor, 2022 WL 4595001, at *3 n.4. Accordingly, there is no basis for this Court to conclude that a higher rate of institution is likely to appreciably increase the risk of injury to plaintiffs' members, given that there is no compelling reason to conclude the chances of cancellation are any different in AIA trials versus federal district court proceedings.

In their opposition, plaintiffs argue that they can show injury without demonstrating a higher risk of patent cancellation as their members "suffer harm to their reputation and good will at the point of institution, regardless of the ultimate determination of patentability." Opp'n at 21–22 (citing Malone Decl. ¶ 28 and Ex. G. to Compl. [ECF No. 1-7] ("Sherman Decl.") ¶ 11). As an initial matter, these allegations appear only briefly in declarations attached to the complaint—they appear nowhere in the complaint itself, despite multiple paragraphs describing the alleged harm of patent cancellation to plaintiffs' members. See Compl. ¶¶ 5–8. Even crediting that those declarations are sufficient, plaintiffs still have not identified a sufficiently concrete and imminent injury. To be sure, focusing on reputational harm may take away one step in the chain—the alleged difference in outcomes in AIA trials versus federal court—but it adds a new dimension of uncertainty: per the plaintiffs' own declarations, the reputational harm can begin at the filing of the IPR petition, a stage at which plaintiffs' proposed rule changes would have no impact. See Sherman Decl. ¶ 11 (noting that "[t]he pendency of the IPR petition"—which begins when the petition is filed and thus before any change from the proposed rule—"was a negative development for our company, even though it was eventually denied"). And even believing plaintiffs' unsupported arguments in their opposition that reputational harm attaches only at the point of institution, there remains a series of other speculative assumptions leading up to the institution decision that defeats their standing claim. Cf. US Inventor, 2022 WL 4595001, at *5 ("[E]ven if

15

we assume [one link to be certain], we must still make a series of improperly speculative assumptions.").

In sum, plaintiffs' theory of injury is too speculative to describe a concrete injury from defendants' denial of their petition. Plaintiffs rely on a "specific, uncertain series of events" based on "conjecture about how independent third parties, i.e. the PTAB and a district court, would act." US Inventor, 2022 WL 4595001, at *4. The injury chain here closely resembles that in Clapper, where the Supreme Court rejected a theory of standing based on a "highly attenuated chain of possibilities" as to agency, court, and third-party action.[5] See 568 U.S. at 410; id. at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."). This Court accordingly lacks subject-matter jurisdiction over plaintiffs' claim and will grant defendants' motion to dismiss on that basis.[6]

## II. Motion for Relief

Defendants also move for relief from Local Civil Rule 7(n), which provides that

> [i]n cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first.

Defendants argue that "[n]one of th[eir] arguments require the Court or Plaintiffs to review the administrative record to either adjudicate or defend against the motion," Mot. for Relief at 1–2,

---

[5] The specific chain of injury in Clapper was:

(1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

568 U.S. at 410.

[6] Because the Court concludes that it lacks jurisdiction over plaintiffs' claim, it will not address defendants' issue preclusion arguments. See Mot. to Dismiss at 22–24.

and that granting such relief will "conserv[e] scarce agency resources," Defs.' Reply in Supp. of Mot. for Relief at 2 (quoting Akbar v. Cuccinelli, Civ. Case No. 18-2808, 2020 WL 1287817, at *4 (D.D.C. Mar. 18, 2020)).  Plaintiffs oppose the motion for relief, arguing that "Defendants' Motion to Dismiss will likely require the Court and Plaintiffs to invoke the administrative record," Opp'n to Mot. for Relief at 2, and accordingly ask the Court to "await production of the record" before deciding defendants' motion to dismiss, id. at 5.  In support, plaintiffs offer four categories of documents they believe would be relevant:

1. "Internal USPTO discussion of Plaintiffs' Rulemaking Petition," which "likely include reflection on how Plaintiff Associations' small entity memberships would benefit from promulgation of the proposed rule";

2. "[A]nalysis of the economic impact of a potential regulation" and its effect on the patent system and USPTO;

3. Documents that speak to "Defendants' subjective awareness of the impropriety in denying" the petition; and

4. Evidence that "highlight[s] differences in the substantive legal questions between" the Eastern District of Texas litigation and this case.

Opp'n to Mot. for Relief at 2–3.

The Court is empowered to grant defendants such relief, and courts in this District routinely do so when "the administrative record is not necessary for [the court's] decision."  Nohria v. Renaud, Civ. A. No. 20-cv-2085, 2021 WL 950511, at *4 n.3 (D.D.C. Mar. 14, 2021) (internal quotation marks omitted).  Here, the Court agrees with defendants that the administrative record is unnecessary to resolve the current motion.  As discussed in detail above, the Court concludes that plaintiffs lack standing to bring this claim.  The administrative record would contain evidence

17

relating to defendants' denial of plaintiffs' petition—not records related to individual members' AIA trials or institution decisions, which may have at least some bearing on the standing analysis.

Indeed, none of the documents identified by plaintiffs as potentially relevant would change the standing analysis. In deciding that plaintiffs lack standing, the Court accepted plaintiffs' assertion that it has members who <u>could</u> receive a different institution decision if the proposed rule was promulgated in its current form. The USPTO's agreement with that assessment would thus not move the needle on how speculative members' potential injuries are. The second and third categories of documents relate squarely to merits, not to standing: the standing analysis assumes that defendants acted improperly in denying the petition and asks whether that denial has injured plaintiffs. Documents proving that the denial was improper—either because the proposed rule would have significant benefits or because of some subjective assessment by defendants—would not speak to members' injury. And the fourth category is relevant only to issue preclusion, which the Court does not reach.

Accordingly, the Court will grant defendants' motion for relief from Local Civil Rule 7(n) and will not require them to compile an administrative record in this case.

## Conclusion

For the reasons discussed above, the Court concludes that plaintiffs lack standing to bring their APA claim and the Court accordingly lacks subject-matter jurisdiction over this case. It comes to this conclusion without any need for review of the administrative record. The Court will accordingly dismiss the case in its entirely. A separate Order consistent with this Opinion will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 12, 2023